# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CAUSE NO.: 2:93-CV-225-JTM-PRC |
| | ) |
| THE SANITARY DISTRICT OF HAMMOND, | ) |
| et al., | ) |
| Defendants, | ) |
| | ) |
| and | ) |
| | ) |
| THE STATE OF INDIANA, | ) |
| Statutory Defendant. | ) |

## OPINION AND ORDER

This matter is before the Court on HSD's Motion for Limited Discovery [DE 529], filed by

Defendant The Sanitary District of Hammond ("HSD") on August 30, 2012. Plaintiff United States

of America filed an Opposition to Defendant's Motion for Limited Discovery on October 4, 2012,

and HSD filed a reply on October 15, 2012. For the reasons set forth below, the Court grants the

motion.

## PROCEDURAL AND FACTUAL BACKGROUND

HSD owns and operates a wastewater treatment plant located in Hammond, Indiana, and

operates the combined storm and sewage collection system in the municipalities of Hammond and

Munster, Indiana.

The Complaint in this case was filed on August 3, 1993, seeking, in part, to require HSD to

manage its sewage in compliance with the Clean Water Act, 33 U.S.C. § 1251, et seq. The Equal

Protection Agency ("EPA") asserts that one of the primary causes of HSD's non-compliance with

the Clean Water Act is that its sewer system is designed to discharge untreated sewage and storm

water from numerous points before the effluent ever reaches the waste water treatment plant.  All of this untreated sewage–Combined Sewage Overflow ("CSO")–is instead dumped directly into the Grand Calumet and Little Calumet Rivers dozens of times each year.  During periods of both wet and dry weather, these overflows exceed water quality standards in violation of the Clean Water Act and HSD's National Pollutant Discharge Elimination System ("NPDES") permit.

After years of litigation, the EPA, the Indiana Department of Environment Management ("IDEM"), and HSD agreed to a consent decree that was entered by this Court in 1999 ("Consent Decree").  The Consent Decree prohibited HSD from violating the effluent limitations in its NPDES permit, prohibited HSD from discharging dry weather flows through any CSOs, and required HSD to design and construct facilities as needed to eliminate the use of the Columbia Ave., Sohl Ave., and Johnson Ave. CSOs (collectively the "CSO Control Project").  The CSO Control Project required HSD to design, construct, and operate a large CSO storage basin (the "CSO Basin").  The CSO Basin would temporarily collect untreated sewage and storm water to avoid discharging from the three CSOs until the sewage could be sent to the waste water treatment plant for processing.  The EPA estimates that, once the CSO Basin is operating, about 80% of HSD's system-wide CSO volume will be captured and treated, rather than being discharged untreated into the rivers.

The Consent Decree set out a specific time line for the various stages of the design and construction of the CSO Control Project.  HSD did not meet the schedule set out in the Consent Decree.  HSD proposed a CSO Basin Preliminary Design in December 2004, and HSD has undertaken preliminary work in furtherance of the CSO Basin Preliminary Design at significant expense and effort over the years.  However, the CSO Basin Preliminary Design was inadequate to satisfy the Consent Decree.  HSD represents that the project has been delayed and stalled at various

times and for various reasons. At the time of the briefing of the instant motion, HSD has not yet completed the designs and construction schedules for the CSO Basin. The EPA represents that HSD continues to experience dry weather discharges in violation of the Consent Decree and that HSD has repeatedly violated its NPDES permit.

Finally, the Consent Decree contains agreed provisions governing the assessment of stipulated penalties for certain events, such as failing to meet milestones related to the CSO Basin. Stipulated penalties also can accrue for dry weather CSOs or exceeding effluent limits imposed by HSD's NPDES permit or the Clean Water Act. The Consent Decree does not specify an individual to assess the stipulated penalties. Rather, the Consent Decree provides that "HSD shall pay stipulated penalties, upon written demand by EPA or IDEM, by the 15th day of the month following the month in which the demand is made." Pl. Br., Exh. 2, ¶ 28.

In June 2011, EPA and IDEM (collectively, the "Agencies") proposed an amended draft Consent Decree that would have required submission of the design for the CSO Control Project in September 2011, with full operation achieved by the end of 2013. Because HSD believed that the EPA had not yet approved the underlying assumptions and models needed for design of the CSO Basin, HSD feared that the proposed timeline was unrealistic. Negotiations ultimately failed.

On August 17, 2011, HSD received notice by letter that, as a result of the failed negotiations, the Agencies were seeking $2,437,000 in stipulated penalties against HSD under the Consent Decree for, in relevant part, (1) failing to complete designs and construction schedules for the CSO Control Project; (2) failing to initiate construction of the CSO Basin; (3) violating the prohibition against dry weather overflows; and (4) violating its NPDES permit effluent limitations ("Penalty Letter"). The Penalty Letter was signed by Tinka G. Hyde, Director, Water Division, Region 5. The Penalty

Letter identified Attorney/Advisor Nicole Cantello as the contact person for follow-up questions and discussion.

Also on August 17, 2011, HSD received from the EPA a Request for Information and Environmental Sampling Pursuant to Section 308 of the Clean Water Act ("First 308 Request"). This letter was also signed by Ms. Hyde as Water Division Director and referred follow-up questions to Jennifer Jungmann of the Director's staff.

After receiving the Agencies' Penalty Letter and because it disagreed with the EPA's demand for stipulated penalties, HSD initiated the dispute resolution and review process to challenge the Agencies' Position (which challenge is hereafter referred to as the "Dispute"). The Consent Decree outlines a multi-step dispute resolution process in Paragraphs 47 and 48, which is detailed below.

The first step, in Paragraph 47 of the Consent Decree, requires informal negotiations:

47.     Any dispute between the United States or the State and HSD arising under or concerning this Consent Decree shall in the first instance be the subject of informal negotiations between the parties to this Decree for a period of fifteen (15) days from the time when a written Notice of Dispute is first given. The period for negotiations may be extended by agreement of the parties to this Decree.

Pl. Br., Ex. 1 (Consent Decree, ¶ 47). On September 15, 2011, HSD invoked informal dispute resolution under Paragraph 47. HSD challenged the Agencies' stipulated penalty demand for the alleged CSO Control Project design/construction violations and dry weather overflow violations on the basis that: (1) any delay in design and construction of the CSO Control Project was caused, at least in part, by the Agencies; and (2) all but one of the dry weather discharges alleged by the Agencies were, in fact, not dry weather discharges.

On September 22, 2011, counsel for the parties had a conference call to discuss the Dispute. From the regulators' side, the participants included Jennifer Lukas-Jackson from the Environmental Enforcement Section of the U.S. Department of Justice (DOJ); Nicole Cantello, Counsel for the EPA; Sushila Nanda, EPA headquarters attorney assigned to the Dispute; and Beth Admire, Counsel for IDEM. Attorney Scott Chinn participated on behalf of HSD. The parties' informal negotiations did not resolve the Dispute. Accordingly, on October 7, 2011, Ms. Lukas-Jackson sent a letter terminating that stage of the process.

Paragraphs 48(a) through 48(d) of the Consent Decree provide for formal dispute resolution before the EPA in the event informal negotiations fail:

48.   Formal dispute resolution shall proceed as follows:

a.   If a dispute between the parties cannot be resolved by informal negotiations under the preceding Paragraph, then the position advanced by EPA or IDEM shall be considered binding unless, within fifteen (15) working days after the end of the informal negotiations period, HSD invokes the formal dispute resolution procedures of this Section by serving on EPA and IDEM a written Statement of Position on the matter in dispute, including, but not limited to, any factual data, analysis or opinion supporting that position, and any supporting documentation relied upon by HSD.

b.   Within fourteen (14) days after receipt of HSD's Statement of Position, EPA and/or IDEM shall serve on HSD a Statement of Position, including, but not limited to, any factual data, analysis, or opinion supporting that position and all supporting documentation relied upon by EPA and/or IDEM.

c.   An administrative record of the dispute shall be maintained by EPA or IDEM and shall contain all statements of position, including supporting documentation, submitted pursuant to this Paragraph.

d.   The Director of the Water Division in EPA Region 5 will issue a final administrative decision resolving the dispute based on the administrative record described in the preceding subparagraph. This

> decision shall be binding upon HSD, subject only to the right to seek
> judicial review pursuant to the following two subparagraphs.

Pl. Br., Ex. 1 (Consent Decree, ¶ 48).

Pursuant to Paragraph 48, HSD timely initiated the formal dispute resolution process on October 31, 2011, by serving its written Statement of Position on the Agencies.

The Agencies responded with a written Joint Statement of Position and a lowered demand of $1,850,000 in stipulated penalties. The lowered demand represented the EPA's decision not to seek stipulated penalties for some violations, namely a portion of the penalties for HSD's failure to submit its complete CSO Basin designs, for eight of the 88 dry weather discharges, and for all of the penalties associated with HSD's failure to timely initiate construction of the CSO Basin. The statement was unsigned by any lawyer or agency representative, and it is not clear to whom it was submitted for review and decision within the EPA. The statement was served on counsel for HSD by DOJ attorney Ms. Lukas-Jackson via email on November 22, 2011.

In accordance with the Consent Decree, the EPA compiled an administrative record for the Dispute, which included the two statements of position and all of the other information that the parties submitted in support of their respective positions.

On November 21, 2011, Ms. Hyde, Water Division Director, delegated the decision making authority for the Dispute to Cheryl Newton, the EPA Region 5 Air Division Director, referencing the fact that Hyde had been involved in the assessment of penalties and stating that the delegation was made "[t]o remove the appearance of partiality." Pl. Br., Exh. 7, ¶ 5. HSD was not advised in advance of this delegation.

On February 27, 2012, HSD received from EPA another Request for Information and Environmental Sampling Pursuant to Section 308 of the Clean Water Act ("Second 308 Requests").

These Second 308 Requests were sent by Ms. Hyde as Water Division Director and reflected that they were copied to Ms. Lukas-Jackson, EPA's DOJ counsel in the Dispute. The Second 308 Requests instructed HSD, in part, to describe in complete detail certain matters regarding CSO projects that HSD had characterized in its October 31, 2011 Written Statement of Position submitted in the Dispute.

On March 8, 2012, counsel for HSD sent Ms. Hyde a letter indicating HSD's intent to comply with the Second 308 Requests. In that letter, counsel reminded Ms. Hyde that the requests were sent while the Dispute was pending and that the February 27, 2012 "Information Request addresses many of the same topics as the parties' ongoing formal dispute." Pl. Br., Exh. 9, p. 1.

On March 12, 2012, counsel for HSD and Ms. Cantello (counsel for the Water Division) received a letter from Andre Daugavietis, attorney/advisor for Ms. Newton (Director for the Air Division), referencing the delegation of decision making authority over the Dispute by Ms. Hyde to Ms. Newton. In the letter, Mr. Daugavietis directed four substantive questions each to HSD and the Water Division, referencing material and information in the administrative record, which Mr. Daugavietis represented he had reviewed. The four questions to the Water Division were:

1) Please explain why the Water Division did not formally inform the District that the District's April 29, 2002 submission failed to fulfill the "design and construction schedule" requirement until January 25, 2005?

2) Please identify in the Administrative Record (or provide copies of) any communications in which the Water Division objected to, or disapproved of, the "design schedule" provided by the District by e-mail dated December 4, 2006.

3) Please identify in the Administrative Record (or provide copies of) any communications with the District, prior to the [2011] Demand Letter, regarding the Water Division's interpretation of the stipulated penalties provisions of the Consent Decree and/or providing notice of potential intent

4)     Please explain the Water Division's statement in the September 25, 2006 letter to the District that "final approval of the size of the basin . . . will be conferred in a Consent Decree to be signed by [the parties]," and whether, in light of this statement, the September 25, 2006 letter could itself constitute "approval" of the basin size for purposes of imposing stipulated penalties under the Consent Decree.

Pl. Br., Ex. 10, pp. 1-2.

Mr. Daugavietis explained,

This information is requested for a thorough review of the issues presented by the dispute. Both parties are instructed to identify any information by the number of the request to which it responds. Please note that the parties and/or counsel are requested to sign their submissions and to ensure that contact names and addresses are provided on documents submitted in this matter.

*Id.* at p. 2. Mr. Daugavietis requested a March 30 response deadline but provided a process for requesting an extension of time. He also established a protocol for avoiding ex parte communications:

Information and documents related to this matter should be submitted to me at the following address:

    Andre Daugavietis
    . . . .

Counsel for the other party should, of course, be provided with full copies of all communications and information submitted in this matter.

If you have any questions, or other communications regarding this dispute, please contact me by e-mail at daugavietis.andre@epa.gov, copying counsel for the other party. In order to avoid *ex parte* communications, if the need arises for telephone discussion of any matters related to this dispute, please use e-mail communication to set up a conference call, including counsel for both parties on all such communication.

*Id.* at p. 3.

Approximately one week later, on March 21, 2012, counsel for HSD wrote an email to Mr. Daugavietis requesting an extension of time to respond to the questions directed to HSD. Mr. Daugavietis forwarded this communication to Ms. Cantello and asked, "with respect to the extension request made by mr. chinn [sic] for the district, do you anticipate requesting an extension?" Pl. Br., Exh. 13, p.1. That was the last HSD heard from Mr. Daugavietis. Neither Mr. Daugavietis nor Ms. Newton, to whom dispute resolution authority had been delegated, participated formally in the dispute resolution process from that point forward.

Later in the day on March 21, 2012, counsel for HSD received a letter addressed to him from Ms. Hyde, Water Division Director, which Ms. Cantello forwarded to counsel for HSD via email. Ms. Cantello's email copied Ms. Lukas-Jackson, DOJ counsel in the Dispute. Ms. Hyde's letter stated, "I am writing to inform you that I am reinstating myself as deciding official for purposes of the formal dispute pending in front of the Agency." Pl. Br., Exh. 14. Regarding the status of the administrative record and the questions posed to the parties by Mr. Daugavietis, Ms. Hyde wrote:

> The administrative record for this matter is now reopened. Please treat the questions included in the email sent by Mr. Daugavietis as an invitation to submit information on the topics included in the questions or on any other matters identified by HSD. On May 1, 2012, I will close the administrative record and subsequently will issue a decision pursuant to Paragraph 48 of the Decree.

*Id*. HSD was not advised in advance of this change of decision maker.

On April 4, 2012, counsel for HSD wrote a seven-page letter to Ms. Hyde, with a copy to Ms. Lukas-Jackson and Ms. Cantello, setting out in detail HSD's questions relating to what HSD considered to be procedural irregularities. On April 16, 2012, Ms. Hyde wrote to Mr. Chinn, acknowledging the April 4, 2012 correspondence, directing him to communicate with Ms. Cantello,

whom Ms. Hyde described as "my counsel," regarding his concerns. Pl. Br., Exh. 16. Ms. Hyde did not provide a substantive response to counsel's inquiries.

On April 25, 2012, counsel for HSD had a brief conversation with Ms. Cantello about the delegation of authority.

On May 1, 2012, HSD answered the questions directed to HSD by Mr. Daugavietis in a supplementation of the record and also documented the April 25, 2012 conversation.

The Water Division did not provide any response to Mr. Daugavietis' four questions. However, the Water Division did supplement the record at some point with six documents dated between June 15, 2001, and September 30, 2004.

In addition to the supplementation of the administrative record for the Dispute, HSD also provided timely responses to the Second 308 Requests as required by the Water Division. Again, those responses contained additional information relevant to the CSO Control Project at issue in the Dispute.

On June 14, 2012, Ms. Hyde, as Water Division Director, issued the Final Administrative Decision. The Final Administrative Decision further reduced the stipulated penalty under the Consent Decree by $434,000 to $1,416,500. The Final Administrative Decision contemplates the same schedule on the CSO Control Project.

Paragraphs 48(e) through 48(f) of the Consent Decree outlines the judicial review process as to the Final Administrative Decision:

> e.    Any administrative decision made by EPA pursuant to the preceding subparagraph shall be reviewable by the Court provided that a notice of judicial appeal is filed by HSD with the Court and served on EPA and IDEM within 30 days of receipt of EPA's decision. The notice of judicial appeal shall include a description of the matter in dispute, the efforts made by the parties to resolve it, the relief requested, and the schedule, if any, within

which the dispute must be resolved to ensure orderly implementation of this Consent Decree. The United States or the State may file a response to HSD's notice of judicial appeal.

f.     In proceedings on any dispute governed by this Paragraph, HSD shall have the burden of demonstrating that the decision of the Director of the Water Division is arbitrary and capricious or otherwise not in accordance with law. Judicial review of EPA's decision shall be on the administrative record compiled pursuant to this Paragraph.

Pl. Br., Ex. 1.

On July 16, 2012, HSD timely filed its notice of judicial appeal, initiating the final stage of the dispute resolution process.

This Court held an initial status conference on August 9, 2012, at which some of these matters were addressed. The Court invited HSD to file its motion for limited discovery by August 30, 2012.

## ANALYSIS

In the instant motion, HSD asks the Court for limited discovery into the EPA's adjudicative process because of what HSD considers to be various procedural irregularities that it believes undermine confidence in the fundamental fairness of the agency's decision making process. HSD has submitted with its motion the limited discovery it proposes to serve on the EPA. HSD contends that it seeks only information relevant to the impartiality (or lack thereof) of the adjudicative process and does not seek purely deliberative materials. The United States objects to the motion, arguing that the proffered discovery seeks to learn both the why and how of the Water Division Director's decision to reduce the EPA's demand for stipulated penalties and that discovery concerning the agency's exercise of discretion is inappropriate. The United States also argues that permitting

discovery defeats the streamlined purpose of the Consent Decree and that this appeal is ripe for resolution without further discovery.

The only question before the Court is whether discover is necessary in order for the Court to evaluate the June 24, 2012 Final Administrative Decision based on the administrative record. Under the terms of the Consent Decree, the Court reviews the agency action under the arbitrary and capricious standard. The scope of a court's review under this highly deferential standard is "narrow" and a "court is not to substitute its judgment for that of the agency." *Judulang v. Holder*, — U.S. —, —, 132 S.Ct. 476, 483 (2011) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

> Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a "rational connection between the facts found and the choice made." In reviewing that explanation, we must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. The reviewing court should not attempt itself to make up for such deficiencies: "We may not supply a reasoned basis for the agency's action that the agency itself has not given." We will, however, "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."

*Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (internal citations omitted); *see also Israel v. U.S. Dep't of Agric.*, 282 F.3d 521, 526 (7th Cir. 2002); *Mt. Sinai Hosp. Med. Ctr. v. Shalala*, 196 F.3d 703, 709 (7th Cir. 1999); *Pozzie v. U.S. Dept. of Hous. and Urban Dev.*, 48 F.3d 1026, 1029 (7th Cir. 1995).

Generally, judicial review of an agency's decision is limited to the administrative record, and in this case, the Consent Decree so dictates. In order to obtain discovery outside of the

administrative record in a case reviewed under the arbitrary and capricious standard, the movant must make a "strong showing" that (1) evidence suggesting bad faith or improprieties may have influenced the decision maker; (2) that the agency has relied on substantial records and materials not included in the record; or (3) the procedures utilized and factors considered by the decision maker require further explanation for effective review. *Sokaogon Chippewa Cmty. (Mole Lake Band of Lake Superior Chippewa) v. Babbitt*, 929 F. Supp. 1165, 1172 (W.D. Wis. 1996) (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971) ("strong showing"), *overruled on unrelated grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977)). "[A] court must scrutinize each matter carefully and individually while holding [the movant] to a significant evidentiary burden." *Sokaogon Chippewa Cmty. (Mole Lake Band of Lake Superior Chippewa) v. Babbitt*, 961 F. Supp. 1276, 1280 (W.D. Wis. 1997).

HSD argues that discovery is warranted in this case because there is evidence suggesting that bad faith or improprieties may have influenced the decision maker. To make a claim of bad faith, "[m]ere assertions that there was bad faith on the part of a decision-maker will not suffice." *Columbus Reg'l Hosp. v. FEMA*, No. 1:10-CV-1168, 2011 WL 3476576, *3 (S.D. Ind. Aug. 9, 2011) (citing *McGoldrick v. Koch*, 110 F.R.D. 153, 156 (S.D.N.Y. 1986)). "The complex of factors which lead a court to conclude that discovery is warranted cannot be generalized. It is necessarily an ad hoc judgment in which the judicial reluctance to intrude into the decisional process of the agency having special competence is overborne by the conclusion that the process may well have gone awry." *Abbott Labs. v. Harris*, 481 F. Supp. 74, 78 (N.D. Ill. 1979) (considering whether to grant discovery in a civil proceeding challenging extended delays in the FDA taking final

administrative action on the plaintiff's cyclamate food additive petition) (citing *Citizens to Preserve Overton Park*, 401 U.S. at 420).[1]

As part of its notice of judicial appeal filed with this Court, HSD raises a claim based on certain alleged procedural irregularities that occurred during the adjudicative process within the EPA between October 31, 2011, and June 14, 2012. HSD identifies the following circumstances as raising the concern as to whether HSD received a fair adjudication:

- Water Division Director Tinka Hyde signed both the August 17, 2011 Penalty Letter and the June 14, 2012 Final Administrative Decision, assuming both prosecutorial and adjudicative roles.

- Water Division Counsel Nicole Cantello acted as counsel to Water Division Director Tinka Hyde with respect to both the August 17, 2011 Penalty Letter and the June 14, 2012 Final Administrative Decision, assuming both prosecutorial and adjudicative roles.

- Water Division Director Tinka Hyde delegated decision making authority to Air Division Director Cheryl Newton "to remove any appearance of partiality" because she had "demanded the payment of stipulated penalties" in the Penalty Letter, but inexplicably later reinstated decision making authority in herself. The timing for doing so suspiciously correlates with the evenhanded communications emanating from Andre Daugavietis, counsel to the presumably impartial Air Division Director Cheryl Newton.

- The Water Division declined to add to the administrative record responses to the critical questions posed to it by Andre Daugavietis. Those questions address issues relevant to the merits of HSD's defense to the Penalty Letter.

- Water Division Director Tinka Hyde declined to provide any explanation to the questions posed by undersigned HSD counsel in the April 4, 2012 letter as to the circumstances of the two switches in decision makers and the status of the administrative record. Ms. Hyde only directed HSD to "my counsel"

---

[1] In *Abbott Labs*, the court allowed discovery, finding that the plaintiff had a made a sufficient "demonstration of impropriety" because of the extended six-year delay by the FDA due to non-technical factors related to the cyclamate petition and because of the FDA's "surprising assertion" that it should even consider such non-technical factors as public opinion. *Abbott Labs. v. Harris*, 481 F. Supp. 74, 78 (N.D. Ill. 1979). Although *Abbott Labs* dealt with an interlocutory appeal of the administrative proceedings, the court applied the same standard for reviewing arbitrary administrative action.

Nicole Cantello. The EPA has not provided any record evidence on the reverse switch of decision makers.

- Water Division Director Tinka Hyde issued two sets of 308 Requests to HSD during the dispute resolution process largely concerning matters related to the subject of the Dispute and also signed the Final Administrative Decision, another instance in which she assumed both prosecutorial and adjudicative roles.

Pl. Br., p. 12 (citations omitted).

In this case, these circumstances justify scrutiny into the circumstances of the decision by Ms. Hyde to initially delegate her decision making authority and later to revoke the delegation. The requested discovery directly pertains to HSD's ultimate burden of proving that the Final Administrative Decision made by Ms. Hyde was arbitrary and capricious in that HSD's principal defense to the Dispute relates to its allegation that the EPA itself delayed approving the design for the CSO Control Project over the last decade. The questions posed to the Water Division by Mr. Daugavietis, counsel Ms. Newton–the substitute decision maker, went to the heart of those assertions.

HSD relies on the Seventh Circuit decision in *Bethlehem Steel Corp. v. United States Environmental Protection* Agency, 638 F.2d 994, 1000 (7th Cir. 1980), to argue that Ms. Hyde improperly mixed prosecutorial and adjudicative functions when she imposed the stipulated penalties on August 17, 2011,and then issued the Final Administrative Decision on June 14, 2012, and when she issued the two sets of 308 Requests to HSD, one of which concerned matters related to the subject of the Dispute, during the dispute resolution process and then signed the Final Administrative Decision, adjudicating the Dispute. Although *Bethlehem Steel Corp.* involved different factual circumstances, the same governing principle applies in this case, namely that, when it appears that agency personnel commingled adjudicative and prosecutorial functions and relied

15

upon improper ex parte communications, documentation of communications and memoranda revealing internal agency procedures are relevant and material. *See id*. at 1000.[2]

In *Bethlehem Steel Corp.*, the court found that, although the provisions of the Administrative Procedure Act did not apply, "the due process clause also requires fundamental fairness to be respected in agency proceedings." *Id*. at 1009.[3] The court quoted the United States Supreme Court decision in *Withrow v. Larkin*: "Concededly, a 'fair trial in a fair tribunal is a basic requirement of due process.' This applies to administrative agencies which adjudicate as well as to courts. Not only is a biased decisionmaker constitutionally unacceptable but 'our system of law has always endeavored to prevent even the probability of unfairness.'" *Bethlehem Steel Corp.*, 638 F.2d at 1009 (internal citations omitted) (quoting *Withrow v. Larkin*, 421 U.S. 35, 46-47 (1975)). While there is a "presumption of honesty and integrity in those serving as adjudicators," *id.* (quoting *Withrow*, 421 U.S. at 47), the "presumption of regularity 'is not to shield . . . action from a thorough, probing, in-depth review,'" *id*. (quoting *U.S. Lines v. Fed. Maritime Comm.*, 584 F.2d 519, 533 (D.C. Cir. 1978) (quoting *Citizens to Protect Overton Park*, 401 U.S. at 415)). The court in *Bethlehem Steel Corp.* recognizes that, although the overlapping of investigative and adjudicative functions does not by itself constitute a due process violation, a court must nevertheless determine "from the special facts

---

[2] In *Bethlehem Steel Corp. v. United States Environmental Protection* Agency, the EPA was exercising its permitting oversight function under a provision of the Clean Air Act that granted the EPA authority to judge whether or not a state variance complied with the terms of the law. 638 F.2d 994, 996 (7th Cir. 1980). The EPA had the authority to veto non-compliant variances within a ninety-day time window. *Id*. at 1003. The Seventh Circuit Court of Appeals found that the EPA's disapproval of the state variance for Bethlehem Steel was untimely and unsupported and, in addition, was concerned that the decision had been improperly influenced by the EPA's enforcement personnel who were simultaneously engaged in litigation against Bethlehem Steel on the same issues. *Id*. at 1008. Bethlehem alleged violations of its due process rights.

[3] The relevant provision of the Administrative Procedure Act provides: "An employee or agent engaged in the performance of investigative or prosecuting functions for an agency in a case may not, in that or a factually related case, participate or advise in the decision, recommended decision, or agency review pursuant to section 557 of this title, except as witness or counsel in public proceedings." 5 U.S.C. § 554(d).

and circumstances presented in a case before it that the risk of unfairness is [not] intolerably high."
*Id*. (citing *Withrow*, 421 U.S. at 58).

In its brief, the United States does not contest the principle that enforcement and adjudicative roles should be separate. Notably, Ms. Hyde gave this very reason–her involvement in the assessment of the stipulated penalties–for her delegation of her decision making authority to Ms. Newton in the first instance. As in *Bethlehem*, the Court finds that, although the EPA "does enjoy certain presumptions of regularity, there exist sufficient questions regarding the propriety of the Agency's procedures" to warrant the requested discovery. *Id*. at 1010.

The United States offers an explanation for why Ms. Hyde revoked the delegation of authority. Without citation to affidavit, the United States explains that, after being deputized to issue a Final Administrative Decision on this Dispute, Ms. Newton was promoted from Air Division Director to Deputy Regional Administrator and was no longer able to continue with the task. Ms. Hyde then resumed the decision making authority delegated to her under the Consent Decree, which specifically provides that the Director of the Water Division in EPA Region 5 will issue a final decision resolving the dispute. Thus, the United States argues that the change of decision makers from Ms. Hyde to Ms. Newton and back to Ms. Hyde does not demonstrate "bad faith" on the part of the EPA but at most reveals an agency's internal adjustment after a well-meaning, but unnecessary, internal delegation. The United States suggests that it followed the precise process contemplated by the parties and provided for in the Consent Decree.

However, HSD replies that the removal of Ms. Newton as the decision maker does not appear to coincide with her promotion to Deputy Regional Administrator but instead coincides with Mr. Daugavietis' investigation. The decision making authority was delegated to Ms. Newton on

November 21, 2011. On March 12, 2012, Mr. Daugavietis, counsel to Ms. Newton, sent his requests to HSD and to Ms. Cantello in her role as counsel for the Water Division. By that time, Ms. Newton had already been promoted to Deputy Regional Administrator, as Mr. Daugavietis identifies Ms. Newton with that title in the letter. *See* Pl. Br., Exh. 11. HSD notes that the letter from Mr. Daugavietis did not suggest that Ms. Newton's promotion would interfere with her ability to decide the Dispute. Nevertheless, one week later, Ms. Hyde removed Ms. Newton and "reinstall[ed] [her]self as deciding official for purposes of the formal dispute pending in front of the Agency," Pl. Br., Exh. 14, after Mr. Daugavietis sent an email earlier that same day asking Ms. Cantello if she anticipated needing an extension of time to respond to the questions he had posed to the Water Division.

HSD notes that neither Ms. Hyde's letter nor the Final Administrative Decision referenced Ms. Newton's position as Deputy Regional Administrator as a factor in the decision by Ms. Hyde to reinstate herself. The Final Administrative Decision provides that she did so "to be consistent with Consent Decree language in Paragraph 48(d)." If, as the United States asserts, Ms. Newton's other responsibilities in her role as Deputy Regional Administrator impaired her availability to serve as the decision maker in this Dispute, the discovery that HSD has requested will bear that out.

The United States argues that it did supplement the administrative record after Mr. Daugavietis posed his questions with documents that provided the necessary information and context sought by Mr. Daugavietis. The United States contends that there is nothing wrong with how the EPA chose to supplement the record with documents rather than written answers. HSD disagrees, arguing that the EPA's supplemental documents did not address the questions posed by Mr. Daugavietis. First, the four questions by Mr. Daugavietis asked for an "explanation," which is not

provided by the documents. Second, although the Water Division did supplement the administrative record with six documents dated between June 15, 2001, and September 30, 2004, Mr. Daugavietis' questions related to events that occurred in or after 2005. HSD notes that, in the Final Administrative Decision, Ms. Hyde generally dismisses any responsibility on the part of the EPA with respect to the delay in the design and construction of the CSO Basin. It may be that the EPA's supplemental documents, which predate the time period addressed by Mr. Daugavietis, go to those same issues. That, too, is a factor to be considered on the merits of the appeal.

The United States' repeated assertion that HSD is seeking discovery into the "why" of the Final Administrative Decision, including why Ms. Hyde decided to decrease the final assessment of stipulated penalties, is misplaced. Rather, the proposed Interrogatories and Request for Documents submitted by HSD seek information as to:

> -Who determined that the Water Division Director should (1) relinquish decision making authority and (2) later reclaim it; how were those determinations made; when were they made, and why?
>
> -To what extent did Water Division Director Hyde and her counsel, Ms. Cantello, serve dual prosecutorial and adjudicative functions in this dispute?
>
> -What are the agency rules regarding separation of enforcement and adjudicative functions, and to what extent were those rules followed or disregarded in this matter?
>
> -What are the agency rules regarding ex parte communications in adjudicative matters, and to what extent were those rules followed or disregarded in this matter?

Pl. Reply, p. 8-9. The proposed discovery is narrowly tailored to address these topics only.

In this vein, the United States contends that the discovery sought by HSD is protected by the deliberative process privilege. The privilege protects "documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decision and policies are formulated." *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S.

1, 8 (2001) (citing *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150 (1975)). "Since frank discussion of legal and policy matters is essential to the decisionmaking process of a governmental agency, communications made prior to and as a part of an agency determination are protected from disclosure." *United States v. Farley*, 11 F.3d 1385, 1389 (7th Cir. 1993) (citing *NLRB*, 421 U.S. at 150-52). As noted above, HSD is not seeking discovery into why Ms. Hyde arrived at the decision she articulated in the Final Administrative Decision but rather into the administrative procedures that led to her delegation and reassertion of authority. Moreover, the United States does not identify any specific responsive documents to which it argues the privilege attaches. Thus, the Court overrules the objection.

The United States also opposes discovery by focusing on the fact that Ms. Hyde *reduced* the final amount of stipulated penalties, which the United States equates with "an exercise of EPA's enforcement discretion that is not reviewable." Resp., p. 9. However, the United States again mischaracterizes both the action of the EPA, the discovery sought by HSD, and the nature of the appeal. First, the United States cites case law addressing judicial review of agency decisions to refuse enforcement, which is not the instant case. *Id.*[4] Second, HSD is not seeking discovery on why Ms. Hyde decided to reduce the penalty assessed; HSD seeks discovery on the procedures for the delegation and redelegation of decision making authority. Third, HSD in its appeal is not asking the Court to review the decision to reduce the stipulated penalties; HSD is asking the Court to

---

[4] Citing *Heckler v. Chaney*, 470 U.S. 821, 831 (1985); *Fleszar v. United States Dep't of Labor*, 598 F.3d 912, 914 (7th Cir. 2010); *Bd. of Trade v. Sec. and Exch. Comm'n*, 883 F.2d 525, 530 (7th Cir. 1989); *Arnow v. NRC*, 868 F.2d 223, 230-234 (7th Cir. 1989).

review the decision to impose stipulated penalties and how they were calculated, which will necessarily include, but is not limited to, the reduction of penalties.[5]

Finally, the United States argues that opening this dispute to discovery defeats the purpose of the Consent Decree. The United States contends that, allowing discovery under these circumstances defeats one of the primary objectives of the Consent Decree and deprives the United States of the benefit of the bargain the parties struck, namely the implementation of an efficient and predictable process for collecting agreed upon penalties for violations of the decree. This objective does not override the interest in a fair adjudicatory process.

Given the arbitrary and capricious standard of review that the Court will apply in reviewing the EPA decision, HSD is entitled to information about whether it received a fair adjudication in the EPA or a predetermined one. By allowing this limited discovery, the Court is not finding that bad faith or improprieties in fact influenced the Final Administrative Decision. Rather, the Court finds that HSD has made a "strong showing" that the evidence of record "suggests" that bad faith or improprieties "may have influenced the decision maker." The evidence obtained through the limited discovery to be allowed by the Court may prove otherwise. However, because the circumstances overall raise questions regarding the manner in which the adjudication of the Dispute proceeded, the Court finds that the limited discovery proposed by HSD is appropriate.

**CONCLUSION**

---

[5] Similarly, the United States argues that Ms. Hyde's initial assessment of the stipulated penalties gives no cause for concern because she discounted the penalty initially sought in the EPA's (unsigned) Statement of Position by $434,000. However, this argument goes not to the question on the instant motion of whether discovery should be allowed under the circumstances but rather to the ultimate question of whether the Final Administrative Decision was arbitrary and capricious.

Based on the foregoing, the Court hereby **GRANTS** HSD's Motion for Limited Discovery [DE 529]. The Court **ORDERS** Defendant The Sanitary District of Hammond, upon receipt of this Opinion and Order, to serve on Plaintiff United States of America the Requests for Production and the Interrogatories in a form identical to that in Exhibits 1 and 2 attached to the Declaration of A. Scott Chinn submitted in support of the instant motion. The Federal Rules of Civil Procedure shall govern the United States of America's response deadlines.

So ORDERED this 18th day of December, 2012.

s/ Paul R. Cherry
MAGISTRATE JUDGE PAUL R. CHERRY
UNITED STATES DISTRICT COURT

cc:     All counsel of record